Matter of Christopher MM. v Mackenzie NN. (2025 NY Slip Op 01982)

Matter of Christopher MM. v Mackenzie NN.

2025 NY Slip Op 01982

Decided on April 3, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 3, 2025

CV-23-0594
[*1]In the Matter of Christopher MM., Respondent,
v
Mackenzie NN., Appellant. (Proceeding No. 1.)
In the Matter of Mackenzie NN., Appellant,
v
Christopher MM., Respondent. (Proceeding No. 2.)

Calendar Date:January 13, 2025

Before:Egan Jr., J.P., Clark, Reynolds Fitzgerald, Fisher and Mackey, JJ.

Michelle I. Rosien, Philmont, for appellant.
Larisa Obolensky, Bovina Center, for respondent.
Lisa K. Miller, McGraw, attorney for the child.

Fisher, J.
Appeal from an order of the Family Court of Chemung County (Mary Tarantelli, J.), entered February 10, 2023, which, among other things, granted petitioner's application, in proceeding No. 1 pursuant to Family Ct Act article 6, for custody of the parties' child.
Mackenzie NN. (hereinafter the mother) and Christopher MM. (hereinafter the father) are the unwed parents of one child (born in 2021). Since as early as 2017, the parties maintained an on-and-off relationship in New York that was marked by multiple instances of arguments and physical violence. When the child was born, the parties were separated and the mother lived in Florida with her grandparents. About two months after the child's birth, the mother returned to New York with the child and the parties resumed living together. Shortly thereafter, the parties again separated and the mother left the father's home with the child, relocating several times in a short time period. In January 2022, the father filed a petition seeking custody of the child and to prevent the mother from relocating to Florida with the child. In August 2022, the mother filed a cross-petition also seeking custody, as well as permission to move to Florida with the child. Family Court issued a series of temporary orders which, among other things, awarded the parties joint legal custody, with primary physical custody to the mother and parenting time to the father, and further directed that neither party shall remove the child from Chemung County for residential purposes. Following a fact-finding hearing, Family Court denied the mother's request for permission to move to Florida with the child, and, as relevant here, directed that if the mother remains in Chemung County, the parties were to have joint legal custody with a shared parenting schedule; however, if the mother moved from Chemung County, the father was to have primary physical custody. The mother appeals.
The mother contends that Family Court should have granted her permission to relocate to Florida with the child. We disagree. When making an initial custody determination, Family Court's paramount concern is the best interests of the child (see Matter of Brandon QQ. v Shelby QQ., 216 AD3d 1212, 1213 [3d Dept 2023]). "Although a parent's decision to reside in a distant locale is a very important factor among the constellation of factors to be considered in arriving at a best interests determination, other pertinent circumstances must be considered" (Matter of Alexander K. v Jaheria L., 230 AD3d 966, 967 [3d Dept 2024] [internal quotation marks and citations omitted]), including "each parent's past performance, fitness and ability to maintain a stable home environment and provide for the child's overall well-being, as well as the parents' respective willingness to foster a positive relationship between the child and the other parent" (Matter of Megan UU. v Phillip UU., 193 AD3d 1287, 1288 [3d Dept 2021]). Indeed, strict application of the Tropea relocation factors [*2]is not required where, as here, an initial custody determination involves a parent who seeks to relocate with a child (see Matter of O'Hara v DeMarsh, 161 AD3d 1271, 1272 [3d Dept 2018]). In conducting our review, "[t]he credibility assessments and factual findings of Family Court are entitled to great deference, and we will not disturb its custody determination so long as it is supported by a sound and substantial basis in the record" (Matter of Kody O. v Maya P., 227 AD3d 1196, 1196 [3d Dept 2024]).
The evidence at the fact-finding hearing revealed an acrimonious relationship between the parties, highlighting numerous attempts at reconciliation that devolved to verbal or physical arguments.[FN1] The record also established that the mother, who had been the child's primary caretaker, was prone to hasty decision-making, and that the child's presence in New York would allow the father to provide the child with a more stable environment. Indeed, although the mother sought to relocate to benefit from a strong support system in Florida, and the maternal great-grandfather provided unwavering testimony as to his commitment to the child, she chose to leave that behind with little-to-no planning soon after the child was born. In addition, the supports available to the child in Florida substantially mirrored those available in New York, as the paternal grandmother who resided in the father's home was available as a reliable source of childcare, and the father's proximity to the child allowed him to intervene and offset the mother's shortcomings.[FN2] Further, the record contradicted the mother's assertion that she was willing and able to maintain contact and work to foster a positive relationship between the father and the child if she could relocate to Florida. Specifically, after the child was hospitalized for two days in December 2022, the mother testified that she was "tired" from the ordeal and had not purposely ignored the father's requests for information; yet, she admitted that, as of her testimony four to five days later, she still had not provided the father with any details. Even though the appellate attorney for the child contends that the mother had otherwise dutifully maintained communication with the father and advocates for her relocation to Florida with the child, Family Court properly considered the mother's history of exposing the child to concerning and unstable environments, as well as instances where the father was ultimately unable to spend time with the child due to the mother's actions. In view of the foregoing, and giving the requisite deference to Family Court's assessment of the witnesses' credibility, we conclude that a sound and substantial basis exists to support the determination that the child's best interests were served by denying the mother permission to relocate and by granting the parents joint legal custody and a shared schedule of parenting time (see Matter of Brian VV. v Heather WW., 218 AD3d 860, 863-864 [3d Dept 2023]; Matter [*3]of Shane FF. v Alicia GG., 199 AD3d 1264, 1266 [3d Dept 2021]; Matter of O'Hara v DeMarsh, 161 AD3d at 1274). We have examined the remaining contentions of the parties and have found them to be without merit or rendered academic by a subsequent order modifying certain terms of the order on appeal.
Egan Jr., J.P., Clark, Reynolds Fitzgerald and Mackey, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: Upon the parents' joint motion following the conclusion of the hearing, Family Court took additional testimony from the parties regarding a physical altercation between them that required police intervention and resulted in personal injuries to the father. Ultimately, Family Court recognized that the parents' relationship was marred by "episodes of domestic violence" fueled by their immaturity; in addressing those incidents, the court noted that it could not determine the cause of those fights, the initial aggressor or "the more egregious aggressor."
Footnote 2: For example, the father was able to provide clothing and baby formula to a babysitter when the mother failed to, and he was able to seek urgent medical attention when the child had suffered what was described as a hair tourniquet, which occurs when a hair or fiber becomes wrapped tightly around a child's digit or appendage, such as a toe, in a manner that inhibits or prevents adequate circulation.